IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 18, 2012

## JEFF HENSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bradley County**
**No. 11-CR-565     Amy Armstrong Reedy, Judge**

_____

**No. E2012-00856-CCA-R3-PC - Filed November 26, 2012**

_____

The Petitioner, Jeff Henson, pled guilty[1] to sexual exploitation of a minor, aggravated sexual exploitation of a minor, attempted aggravated sexual battery, driving under the influence third offense, and possession of a firearm during the commission of a felony.  The trial court sentenced the Petitioner, as a Range I offender, to an effective sentence of twelve years of confinement followed by community supervision for life.  The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after holding a hearing. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because his trial counsel was ineffective and because his guilty plea was not knowingly and voluntarily entered.  After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

David K. Calfee, Cleveland, Tennessee, for the appellant, Jeff Henson.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Steven Bebb, District Attorney General, and A. Wayne Carter, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION

_____

[1]It is unclear from the record whether the Petitioner entered a plea of guilty or a plea of no contest to the listed charges.

## I. Facts

A Bradley County grand jury indicted the Petitioner in three separate indictments that were disposed of pursuant to one plea agreement. In the first case, the Petitioner was indicted for driving under the influence, third offense, felonious possession of a handgun, and reckless endangerment with a deadly weapon. While released from jail on bond in this case, the grand jury indicted the Petitioner for aggravated sexual battery of a minor based upon allegations of sexual conduct with his niece. Once again the Petitioner was released from jail on bond when he was charged with sexual exploitation of a minor and aggravated sexual exploitation of a minor based upon pornographic images contained on his personal computer.

### A. Guilty Plea Hearing

At the Petitioner's guilty plea submission hearing, the State provided the following factual basis for the Defendant's guilty plea to attempted aggravated sexual battery, aggravated sexual exploitation of a minor and attempted aggravated sexual exploitation of a minor:

> In Case Number 10-379, the attempted aggravated sexual battery case, on the date alleged in the indictment the [Petitioner] was babysitting a small child that was at his home. The child stated that while she was there she was sitting in [the Petitioner's] lap and that he touched her crotch area and advised that it was on top of her clothes and that he asked h[im] to take a bath with her. The child was taken to the Children Advocacy Center and was interviewed by the forensic interviewer and again made the exact same statement. [The Petitioner] was interviewed, he denied that he touched the child, however he did admit that she was there on the date that the child said this happened, he admitted that she was sitting in his lap but he denied doing that. However, in the possession of child pornography case in his interviews with the investigators he stated that the reason he was downloading child pornography was to try to beat the aggravated sexual battery case. We obviously would argue if this case is to go to trial that there would be a nexus now between those two cases to bring in evidence of the child pornography into the aggravated sexual battery case or the aggravated sexual battery case into the possession of child pornography case as a result of that statement to investigators. In the child pornography case Detective J.T. Allman was conducting an online investigation using an intellinetwork and as a part of that program he can access other people's computers through a pier network, and the whole purpose of Detect[ive] Allman's program is to find people who are

-2-

possessing or trafficking in child pornography. He made contact with [the Petitioner]'s computer. In the share folder there were files that lead Detective Allman to believe that it was child pornography and Detective Allman as a result of it being in a shared folder was able to download these images and videos. Looking at these images and videos it was obvious to Detective Allman and to Detective Sergeant Scoggins that it was in fact child pornography. They obtained and executed a search warrant at [the Petitioner's] residence. Upon executing a search warrant they took his computer and a forensic evaluation of the computer showed well over a 100 images, approximately 795 total images of confirmed child pornography on [the Petitioner's] computer. When they interviewed [the Petitioner] he claimed that the child pornography got on his computer as a result of other people downloading pornography onto his computer. However investigators interviewed the people that [the Petitioner] identified as being the people who would have downloaded it. All of the people that were interviewed [ ] stated that that was not true, that they never downloaded any child pornography or pornography on to [the Petitioner's] computer. Most of them stated that they had never used his computer at all. Those people would be called in to testify if we were to go to trial in this matter. The aggravated sexual battery is being reduced as a part of this plea just to keep the victim from coming in and testifying and for no other reason than that, your Honor, and also the amount of time that [the Petitioner] is receiving as to these charges. . . . .

The State went on to describe the factual basis for the Petitioner's remaining charges as follows:

Your Honor, as to [the other] charges against [the Petitioner], Count One and Two, Count Two merges into Count One, and that's DUI Third, and Count Three i[s] felon in possession of a handgun, and Count Four is being nolled pursuant to the plea agreement. . . .[O]n the date alleged in the indictment Trooper Hamilin Asbell with the Tennessee Highway patrol stopped for a welfare check on 1-75. When he made contact with [the Petitioner] he exited the car and staggered and he smelled a strong odor of alcohol on his brea[th] and person. He could not complete any sobriety test. On an inventory of the car he did fin[d] a loaded handgun in the car.

The trial court then ensured that the Petitioner understood the rights that he was waiving by entering his plea. After so doing, the trial court accepted the Petitioner's plea to sexual exploitation of a minor, aggravated sexual exploitation of a minor, attempted aggravated sexual battery, driving under the influence, third offense, and possession of a firearm during

the commission of a felony. The trial court sentenced the Petitioner to four years for the attempted aggravated sexual battery conviction, stating that he would also be subject to community supervision for life as a result of this conviction. The trial court sentenced him to eight years each for the Petitioner's convictions for sexual exploitation of a minor and aggravated sexual exploitation of a minor, and the trial court ordered those sentence run concurrently with each other but consecutively to his four- year sentence for the attempted aggravated sexual battery conviction. The trial court ordered the Petitioner to serve eleven months and twenty-nine days for the Petitioner's DUI sentence, to be suspended after service of 120 days. Finally, the trial court sentenced the Petitioner to a concurrent one-year sentence for the firearm possession for a total effective sentence of twelve years.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel ("Counsel") was ineffective and that his guilty plea was not knowingly and voluntarily entered. At a hearing on the petition, the parties presented the following evidence: The Petitioner's sister, Janice Crawford, testified that she and the Petitioner were, and always had been, "very close." Crawford said the Petitioner had "battled mental health since he was 14," explaining that he suffered from bipolar disorder. Crawford testified that the Petitioner had been hospitalized an estimated fifteen times since he was diagnosed, and she said that he took Lithium to treat his disease. Crawford described the effects of the Petitioner's mental disease, saying that he had "severe high's to severe lows." She recounted that, at times, he would appear coherent and, at other times, he would be incoherent. When the Petitioner was incoherent, he was "[t]otally irrational, couldn't make a decision, unable to function, couldn't handle money, didn't or couldn't understand when you tried to reason with him, couldn't even listen to you. He would look at you but you knew he wasn't hearing anything you said, he was in a different zone." Crawford said that she and her parents had been living with the Petitioner acting this way on an almost monthly basis.

Crawford testified that the Petitioner had no computer skills to speak of and that, when he got a computer, Crawford herself took care of it. She said she set up every program on it and taught him the basic functions for use. Crawford testified that, anytime the Petitioner's children sent him pictures, she had to go to the Petitioner's house and download them for him. Crawford testified that, many times, the Petitioner clicked on emails that he thought were from people that he knew and, as a result, he downloaded viruses onto his computer. She said, weekly, she went to his house to fix his computer. Crawford said there was "[n]o way" that the Petitioner had the "capability of installing anything on that computer," including any file sharing program. Crawford explained that the Petitioner's ex-wife also had access to his computer.

-4-

Crawford said she only met with the Petitioner's trial counsel on the day of the Petitioner's guilty plea submission hearing. Counsel told Crawford and her parents that the Petitioner needed to plead guilty in exchange for a twelve-year sentence and that he was probably going to receive a twenty-five to forty-year sentence if he did not. Counsel, she said, told them that if the Petitioner pled guilty he would be sent to a prison that "was basically a mental hospital that had a fence around it." Crawford said she later learned that there was no such prison.

During cross-examination, Crawford agreed that although she spoke with the Petitioner every day and saw him two or three times per week, she was not living with him during the time period when he was arrested. Further, she worked during the day and would see him for short periods of time during the evening. Crawford explained that when the Petitioner was hospitalized throughout the years, it was a result of his failing to take the medication that was prescribed to him. She said, however, that even when the Petitioner was on his medication he did not function normally and sometimes required hospitalization.

Crawford conceded that the Petitioner obtained some ability to use his computer, saying he learned how to access his bank account balance online, retrieve emails, and navigate the internet. Crawford said that Counsel told her that he would do his best to get the Petitioner into the "special needs" unit in the prison.

During redirect examination, Crawford testified that Counsel told her that if the Petitioner pled guilty, the district attorney would agree to the Petitioner going to a prison that was "basically a mental health facility with a big fence around it." Crawford further explained the effects of the Petitioner's medications, saying that if the Petitioner took too much medicine it affected him the same way as if he had not taken enough. Crawford recalled that, when the Petitioner was incarcerated on these charges before pleading guilty, the jail gave him too much medicine. This resulted in a heart attack and the Petitioner requiring admission to the Erlanger hospital ICU.

The Petitioner testified that he pled guilty in this case to five charges and that he was currently serving a twelve-year sentence. He recalled that the only times he met with Counsel were one time at Counsel's office while the Petitioner was released on bond and then the day he entered his guilty plea. On both occasions, Counsel did not talk to the Petitioner about the facts of the case and instead told the Petitioner he needed to plead guilty or he would receive a forty-year prison sentence. The Petitioner testified that Counsel told him that, if he pled guilty, he would serve his sentence in a "nursing home." The Petitioner said that he wanted Counsel to speak with his parents because they were present in the room when this incident allegedly occurred. The Petitioner said there was "no truth" to the allegation and that it was "an out right lie." He said he never touched the child.

The Petitioner testified that he had suffered from bipolar disorder his whole life, saying that he had been institutionalized nineteen times in Moccasin Bend and forty-two times in "GMHI" in Atlanta. He said he was currently taking Lithium for his diagnosis and that he had been on Lithium for thirty-eight years. The Petitioner said that he was currently prescribed 900 milligrams of Lithium daily. The day of his guilty plea hearing, the jail gave him 1800 milligrams of Lithium, which was "way toxic" for him. He said that his medication levels were so "bad" that he was "drooling at the mouth and [his] right hand shook the whole time." He said he sat on his hand to keep it from "hopping." The Petitioner recounted that, due to his high medication dosage, he could not stand up or walk straight, saying the he walked into walls and rolled down the stairs. The Petitioner said that people were handing him documents saying, "Here, sign this." He said he had no glasses, he could not see to read, and he did not know what was going on.

The Petitioner recalled a mental health evaluation administered at Hiwassee Mental Health before his guilty plea hearing. He recalled that he "did good" that day, meaning he could answer and talk and was not shaking badly. He said he could respond appropriately to the evaluator. He estimated that the evaluation lasted two hours. The Petitioner said he had been to Hiwassee Mental Health facility on multiple previous occasions because he had to go here to get his medication.

The Petitioner testified that, at the time of his arrest, he was taking "12" Lithium but that they increased his dosage when he went to jail because he was having difficulty falling asleep. The Petitioner recounted again that, when they increased his dosage to "1800," he could not put on his clothes, and he was constantly throwing up. He said he told the woman administering his medication that there was something wrong, and she insisted that he take his prescribed medication. The Petitioner did as he was told, and, shortly thereafter, he suffered a heart attack and was transported to Erlanger hospital.

During cross-examination, the Petitioner testified that he had previously been convicted of driving charges and for "pointing a pistol." He explained that the "pointing a pistol" conviction was a felony but that it occurred nineteen years ago. At the time he pled guilty in that case, a court-appointed lawyer represented him. The Petitioner said that he also had "multiple" convictions for DUI but that there had been a period of nine years during which he had not received any new convictions. He said that he had never had a jury trial, pleading guilty to each of his convictions, and that he had been to jail twice. He said he understood that each time he chose to plead guilty he had a right to a trial.

The Petitioner testified that when he said his levels of Lithium were "toxic" he meant that he took so much that it made him throw up and rendered him unable to understand questions and answer them properly.

-6-

During further cross-examination, the Petitioner admitted that he had told the investigating officer in this case that he had downloaded the child pornography onto his computer. He agreed he told the officer that some man told him how to do this, and then he did it himself.

Counsel testified that, initially, he was appointed to represent the Petitioner on charges stemming from his possession of a firearm by a convicted felon and DUI, third offense. While the Petitioner was on bond for those charges, he was arrested for aggravated sexual battery. While on bond for the aggravated sexual battery charge, he was arrested for sexual exploitation of a minor and aggravated sexual exploitation of a minor.

Counsel recounted that the aggravated sexual battery charge involved the Petitioner allegedly groping his eight-year-old niece, the victim, while the two were at the Petitioner's mother's house. The allegation included that he whispered into her ear that he wanted to take a bath with her. When her mother picked her up later that evening, the victim told her mother, who contacted law enforcement. Counsel said that the sexual exploitation charges all stemmed from images and videos found on the Petitioner's computer.

Counsel refuted the Petitioner's claim that he did not adequately interview the Petitioner's parents. He said that the Petitioner's parents came to his office on more than one occasion, and that he spoke with the Petitioner's mother on the phone "periodically" from the first DUI charge through the date of the guilty plea hearing.

Counsel said that his file indicated that there were "a number" of dates upon which he spoke with the Petitioner or met with the Petitioner. He disagreed that he and the Petitioner met only twice. He said, during these meetings, the two discussed the facts of each of the charges the Petitioner was facing. Counsel said that he did not think the proof supporting the DUI charge was significant. Similarly, he thought that the Petitioner might prevail on the charge of aggravated sexual battery, because the Petitioner's family was present during the incident and said they saw nothing consistent with the victim's claim. Counsel said that he and the Petitioner intended to take these charges to trial. Counsel's chances of success defending these two charges, however, diminished when the Petitioner was subsequently charged in the child pornography cases. At that point, the Petitioner said he no longer wanted to take the cases to trial and wanted Counsel to negotiate a guilty plea agreement with the State that addressed all of the cases.

Counsel testified that he met with Janice Crawford, the Petitioner's sister, and they discussed the Petitioner's medications. Counsel said he was already aware of the Petitioner's mental health at the time he met with Crawford.

Counsel said that he had listened to the Petitioner's recorded interview with Detective Allman. He discussed that interview with the Petitioner and also discussed his options of going to trial or agreeing to enter a plea of guilty. Counsel said he discussed with the Petitioner the possible sentence he faced, which included the issue of consecutive sentences because the Petitioner was on bond when he committed the subsequent offenses.

Counsel said he negotiated a plea offer with the State under which the Petitioner would serve twelve years at 100%. Counsel informed the Petitioner of this plea offer and discussed with the Petitioner his right to go to trial. The Petitioner never expressed to him an intention to go to trial, and the Petitioner signed the paperwork agreeing to the State's plea offer. Counsel recalled that, after he discussed the Petitioner's rights with the Petitioner, the trial court also discussed these same rights during the guilty plea hearing. The Petitioner, at that time, indicated that he had no questions.

Counsel said that the Petitioner was evaluated by Hiwassee Mental Health and that the evaluators reviewed the Petitioner's previous mental health records.

During cross-examination, Counsel conceded that the defense bar, generally, had some issues or complaints about the quality of Hiwassee's Mental Health evaluations. Despite this, Counsel did not request an independent mental evaluation. Counsel agreed that both the Petitioner's parents were present during the time the victim said that he inappropriately touched her. He said that there was no forensic evidence or an independent witness supporting the victim's claim.

Counsel testified that he referred the Petitioner to a special needs facility and also called Teresa Hammons in an attempt to have him placed in such a unit. Counsel conceded that neither he nor the trial court had any control over such referrals and that the decision rested with the Department of Correction.

Counsel said he did not advise the Petitioner he had a right to file a motion to withdraw his guilty plea within thirty days. He said he did review the discovery in each of the cases the Petitioner faced. Counsel said he listened to the Petitioner's recorded statement and reviewed with the Petitioner the contents of that statement. Counsel said that he did not see any physical evidence that led him to question the Petitioner's competency or led him to believe that the Petitioner did not understand their discussions.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief. The post-conviction court found:

The issues are very simple. We have two that are raised here in the post

conviction petition: ineffective assistance of counsel being one; and whether or not he was coerced into pleading guilty. He specifically petitioned saying he was denied effective assistance of counsel which prevented him from entering a knowing and voluntary plea and that he did not make a knowing intelligent voluntary plea. As to effective assistance of counsel the question for the Court, and of course the petition has to be proven. The burden is on the [P]etitioner to prove by clear and convincing proof factual allegations. And the primary allegations that we have seem to involve how much contact [Counsel] had with the [Petitioner] and his family. Now, that's common and there's absolutely no showing here that any counsel is required or should be required, following objective standards, to meet with, counsel with emotionally and otherwise family members of people that are charged. They are charged with defending defendants and often times defendants feel as though they don't spend enough time talking to their lawyer and even more often times family members feel like they don't get to meet with the lawyer with the [Petitioner]. It's absolutely inappropriate for lawyers to meet with defendants and family members and create all sorts of problems that could potentially [be] used against them in a trial. So while I understand that people's feelings get hurt that has nothing to do with competent representation, and the question for the Court is did [C]ounsel's performance fall below objective standards. Did he perform as well as a lawyer with ordinary training and skill in criminal law? I would say at least, and in this case he stands up here and testifies, and the record won't reflect it but he seems to even today have a very clear memory and is very familiar with the people [and the] facts in this case. [Counsel] appears to recall it and recollect it and things that he did, discussions that he had with the District Attorney General, the evidence that he reviewed, the proof that was against him, the cases that he wanted to plead to, or the one case he wanted to plead to and the ones he wanted to go to trial with. And again [Counsel], this Court is familiar with, and he along with the detective that we heard all this proof about here that questioned the [Petitioner], their manner is very thorough, but one of a listener, meek and mild, and not in a bad way, but in a very good way. [Counsel] has again exhibited a very thorough representation in this case. So the [P]etitioner has failed to establish ineffective assistance of counsel based on the criteria that the Court has laid out. His performance did not fall below objective standards as well as any other lawyer with ordinary training and skill in criminal law, and there were no unprofessional errors that would have caused the result to be different. And then moving on to whether or not again that his plea, whether or not it was knowing, intelligent, and voluntary, which is coupled with that effective assistance of counsel, it's obvious from the testimony here today, and Exhibit

Number One, the transcript, that the Court and [C]ounsel substantially if not more than complied with the prescribed litany and his plea obviously passes the due process scrutiny that you have to go through. Does this hearing show that the [Petitioner] intended to plead guilty? It shows it more than one time. It's obvious that [the Petitioner] demonstrated in this litany and in this transcript a desire to plead guilty and all this discussion about the Special Needs Facility and everything that was testified to is right here in the litany, and the very last thing because of that the Court discusses and not only was it discussed the Court told him at the very end referral to a special needs facility in Nashville is if they accept you. We can ask but they have to accept [him]. So all of this coupled together the [P]etitioner failed in the petition here today. . . .

The only other thing I would add is that as to credibility of the witnesses [the Petitioner's] credibility, while painful at times, was effectively attacked in cross-examination and the Court does not find that he was a credible witness here today.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because Counsel was ineffective and because his guilty plea was not knowingly and voluntarily entered.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

## A. Ineffective Assistance of Counsel

On appeal, the Petitioner contends that Counsel was ineffective. He asserts that Counsel failed to adequately investigate the facts of the underlying cases and failed to adequately prepare for trial. He says [C]ounsel should have discussed this case further with his family members, he should have reviewed the tape from his DUI arrest, and he should have filed "some" pretrial motions. The State counters that, based upon the evidence presented, the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad,* 938 S.W.2d at 369).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753

S.W.2d 148, 149 (Tenn. Crim. App. 1988). The court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

After reviewing the Petitioner's contentions, the record, and the post-conviction court's findings, we conclude that the Petitioner has not proven he is entitled to post-conviction relief. The Petitioner was arrested for DUI and being a felon in the possession of a firearm. Counsel was appointed, and the two discussed the facts of the case. While on bond, the Petitioner was arrested for aggravated sexual battery. Counsel said he met with the Petitioner and his family and that they discussed this case and the previous cases. At this point, Counsel and the Petitioner intended to take the two cases to trial. While on bond for these two cases, the Petitioner was arrested for sexual exploitation of a minor and aggravated

sexual exploitation of a minor. In a statement to police, the Petitioner agreed that he had downloaded the pornographic images on his computer after another man showed him how to do so. Counsel said, at this point, the Petitioner wanted Counsel to negotiate a package agreement, encompassing all of the charges. Considering the sequence of these events, and the Petitioner's expressed desire, we do not think it unreasonable that Counsel did not interview more witnesses or file any pretrial motions. The Petitioner has proven neither that Counsel's performance was deficient nor that, but for Counsel's ineffective performance, he would have insisted on going to trial. The Petitioner is not entitled to relief on this issue.

## B. Knowing and Voluntary Guilty Pleas

The Petitioner contends that his guilty pleas were not knowingly and voluntarily entered because he was over-medicated at the time of the guilty plea and suffering from longstanding mental health issues. The State counters that the Petitioner has not proven this allegation because he relies solely upon his own testimony, which the post-conviction court did not credit.

To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. *See Boykin v. Alabama*, 395 U.S. 238, 242-44 (1969); *State v. Mackey*, 553 S.W.2d 337, 340 (Tenn. 1977). A plea meets constitutional muster when the defendant understands both what the plea connotes and its consequences, *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citing *Boykin*, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty. *Jaco v. State*, 120 S.W.3d 828, 831 (Tenn. 2003) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). In *Mackey*, 553 S.W.2d at 341, our Supreme Court set forth the procedure that a trial court should follow when accepting a guilty plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. *See also* Tenn. R. Crim. P. 11(b). A trial court must "substantially comply" with this procedure. *State v. Newsome*, 778 S.W.2d 34, 38 (Tenn. 1989). A trial court can look to a number of factors to find a "knowing and intelligent plea," including "[t]he relative intelligence of the petitioner, the degree of his [or her] familiarity with criminal proceedings, the opportunity to confer with competent counsel and the trial court regarding the charges faced, and the desire to avoid a greater punishment resulting from a jury trial." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993).

During the guilty plea hearing, the trial court asked the Petitioner if he had ever been treated for a mental disease or defense, and the Petitioner responded affirmatively. The trial court further inquired, "Have you had any drugs or alcohol, prescription or otherwise in the last 24 hours," and the Petitioner responded, "Just my regular medicine, ma'am." The trial court asked, "Do you feel clear about what you are doing today?" to which the Petitioner responded, "Yes, ma'am." Counsel told the trial court then, and reiterated to the post-

conviction court that he did not have any problem communicating with the Petitioner. During the post-conviction hearing, the Petitioner testified that he was over medicated at some point during his incarceration. He also said that, on the day of the guilty plea hearing, he was drooling, his hand was shaking, and he was having difficulty walking. Further, he said he did not understand the questions asked of him or the documents he signed. The record indicates otherwise. The Petitioner repeatedly responded correctly to the trial court's questions. Counsel said that he did not see any physical evidence that led him to question the Petitioner's competency or led him to believe that the Petitioner did not understand the consequences of his guilty plea. The post-conviction court found that the Petitioner's testimony was not credible. We defer to the post-conviction court's findings regarding the credibility of witnesses. *See Momon*, 18 S.W.3d at 156. Furthermore, we agree with the post-conviction court that the Petitioner has failed to prove by clear and convincing evidence that his plea was not made knowingly and voluntarily. *See* T.C.A. § 40-30-110(f) (2006); *Momon*, 18 S.W.3d at 156. Therefore, the Petitioner is entitled to no relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the Petitioner has failed to prove by clear and convincing evidence that he was denied the effective assistance of counsel or that his plea was not knowingly and voluntarily entered. We therefore affirm the judgment of the post-conviction court denying relief.

_____
ROBERT W. WEDEMEYER, JUDGE